# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### September 15, 2015 Session

## CARRIE M. THOMPSON v. STEPHEN MATTHEW THOMPSON

**Appeal from the Circuit Court for Rutherford County**
**No. 67169      Robert E. Corlew, III, Chancellor**

_____

**No. M2014-02124-COA-R3-CV – Filed December 30, 2015**

_____

Father appeals the parenting schedule that substantially restricts his parenting time. Without making any findings of fact, the trial court restricted Father's parenting time to 48 hours per month, with no overnight visitation, until the child is three years old. Father contends the severe restrictions on his parenting time are not supported by the evidence. He further contends the trial court erred by severely limiting his parenting time without making any finding that he was guilty of conduct that affected his ability to parent pursuant to Tenn. Code Ann. § 36-6-406(d). In all actions tried upon the facts without a jury, the trial court is required, pursuant to Tenn. R. Civ. P. 52.01, to find the facts specially, state separately its conclusions of law, and enter judgment accordingly. The underlying rationale for this mandate is that it facilitates appellate review by affording a clear understanding of the basis of the trial court's decision; in the absence of findings of fact and conclusions of law, this court is left to wonder on what basis the court reached its ultimate decision. In this case, the trial court did not identify the legal principles it applied or the factual basis for its decision; therefore, it failed to satisfy the Rule 52.01 mandate. Because the trial judge has retired and both parties wish to avoid the cost of a new trial, the parties have requested that we conduct a de novo review of the record, and we have determined that the transcript of the evidence is sufficient for this court to conduct a de novo review to determine where the preponderance of the evidence lies. *See Gooding v. Gooding*, __ S.W.3d __, No. M2014-01595-COA-R3-CV, 2015 WL 1947239, at *1 (Tenn. Ct. App. Apr. 29, 2015). We find Father's inappropriate statements and conduct concerning the child's genitals are directly adverse to the best interests of the child. *See* Tenn. Code Ann. § 36-6-406(d). We also find that the evidence preponderates in favor of a finding of neglect and substantial nonperformance of Father's parenting responsibilities to such a degree as to be adverse to the best interest of the child. *See id.* Accordingly, we affirm the parenting plan that substantially restricts Father's parenting time.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

FRANK G. CLEMENT, JR., P.J., M.S., delivered the opinion of the Court, in which ANDY D. BENNETT and RICHARD H. DINKINS, JJ., joined.

Luke Austin Evans and Heather Graves Parker, Murfreesboro, Tennessee, for the appellant, Stephen Matthew Thompson.

Laurie Young and Joe M. Brandon, Jr., Murfreesboro, Tennessee, for the appellee, Carrie M. Thompson.[1]

**OPINION**

Stephen Matthew Thompson ("Father") and Carrie M. Thompson ("Mother") met and began dating in June 2012. Both Mother and Father were in their mid-thirties, had never been married, and did not have any children. The parties married eight months later, and at the time of the marriage, Mother was pregnant. Mother gave birth to the parties' only child, a son, in June 2013. Four months later, Mother filed for divorce.

The trial court appointed a special master to hear all "interim issues" and to establish a pendente lite parenting plan. Following a hearing held December 2, 2013, the special master appointed Mother the primary residential parent and granted Father limited daytime visitation with no overnight parenting time. The initial plan was modified on July 9, 2014, to extend the hours of Father's daytime visits but continued to exclude overnight visitation.

The matter was tried de novo on July 24 and 25, 2014, and concluded on July 28, 2014.[2] The parties stipulated to the grounds for divorce and entered a joint stipulation as to the real and personal property to be divided. The trial court approved the division of property and declared the parties divorced, leaving only the issue of establishing a parenting plan for the child. The child was thirteen months old at the time of trial. The trial court heard testimony from Mother and Father, among others.

Father proposed a parenting plan for the child that called for equal parenting time, with each parent having the child for alternating five-day periods. Father testified that it was too hard to go seven days between visits. Mother proposed a graduated parenting plan for the child due to her concerns regarding Father's ability to parent. Mother's plan called for Father's parenting time to be limited to daytime visitation until the child reached the age of three and then graduate to one overnight visit each week until the child reached the age of five, at which time Father's parenting time would graduate to every

---

[1] We note with sorrow that Mr. Brandon died unexpectedly on December 10, 2015.

[2] At the beginning of the trial, the chancellor found that the proceedings before him were "de novo of the pendent [sic] lite hearing."

other weekend. Mother testified that the graduated plan would accommodate the child's changing emotional and physical needs and that the child would have better communication skills at the ages of three and five which would allow the child to voice his needs and wants.

At the conclusion of the hearing, the trial court designated Mother as the primary residential parent. With respect to establishing a parenting schedule, which is the only issue on appeal, the trial court restricted Father's parenting time to 48 hours a month, with no overnight parenting time, until the child turns three years old. Specifically, until the child turns three years old, the day-to-day schedule in the parenting plan reads as follows:

> The Mother shall have responsibility for the care of the child or children except at the following times when Father shall have responsibility:
>
>> From: Wednesday at noon until 5:00 p.m. every week, and Saturday from 10:00 until 5:00 p.m. every other week, and Sunday from noon until 5:00 p.m. every other week. The Saturday and Sunday parenting time shall be in the same week.

The parenting time set forth above is to remain in effect until June 2016, when the child turns three years old, at which time Father's parenting time is significantly increased, and he is awarded overnight parenting time. The plan reads as follows:

> Once the child reaches the age of three (3), the following schedule [for Father's parenting time] shall apply:
>
>> From: Friday at 5:00 p.m. until Sunday at 5:00 p.m. every other week.

The parenting plan also sets forth specific schedules for holidays and spring, summer, and fall vacations. Pursuant to the plan that takes effect when the child turns three years old in June 2016, Father will have 52 parenting days each year, and Mother will have 313 days.

The only issue on appeal is Father's parenting time. The trial court made no findings of fact to justify restricting Father's parenting time to 48 hours a month until the child turned three years old. Instead, the pertinent portion of the trial court's ruling from the bench reads as follows:

> [U]nfortunately these folks both have very different personalities, both have very different attitudes. . . . they're both very, very different people. . . .

these folks certainly are as different a husband and wife that we have seen in quite a while. . . . both of them are starting to push the age of 40. The wife . . . was very mature at the time of the marriage. The husband probably still had some wild oats to sow, and that probably was the initiation of the difficulties which they had.

The problems continued -- and the proof shows that as one issue followed another, probably, in fairness, the wife became overly restrictive probably as far as the child is concerned, perhaps in response to the overly promiscuous-type of behavior of the husband. . . .

And the proof developed that the husband, then, was doing things that probably even he as he sits here today would acknowledge, you know, wish I hadn't done that; wish I hadn't suggested that; wish I hadn't been involved in that. And the wife probably, well, I was too harsh; I was too restrictive; I was too difficult in dealing with that situation. She would probably admit that as well.
. . .

As to the divorce itself, . . . [w]e will declare the parties, then, to be divorced.

The parties have agreed in the division of all of their assets and all of their debts, and we will approve that division. Then . . . comes the issue that we have dealt with in about eight or ten or eleven hours of proof, and that is the issue concerning the question of the minor child. And we would recognize, first of all, that -- again, this case being different from a number of other cases we've tried -- this one is different also in that this child is so young. Rarely do we have a contested divorce where the parties have a child who's only a year old or 13 months old. . . .

The concern of the Court . . . revolves around the youthful age of the child, the factors -- and, yes, I suppose with regard to many of the factors that we heard about the mother's version was exaggerated to one extent. Not saying exaggerated based upon the facts, because I don't know the facts other than what I've heard; but it was exaggerated in one direction. And the father talked about many of these same instances and exaggerated the same way the other direction.

And, again, the Court doesn't know what the truth is except what the evidence before it shows. And I would venture to hazard that probably the truth as to each of these issues lies somewhere between the positions of these parties; and on some cases probably much closer to the version the

mother has provided to us, and on some certainly much closer to the version the father has presented to us.

We recognize that as to some of these instances there has been some agreement among the parties, at least, the instance did occur and on others -- suggestion by the father, if you will, that these instances didn't happen or that he doesn't recall them. And that's -- the Court simply has the evidence from all of the parties to consider.

I think concerning all of the issues we must find based upon the issues that we have heard that probably until the child turns three years old that we should adopt the mother's plan and not engage any overnight visitation.

In this appeal, Father challenges the parenting schedule ordered by the trial court. Father contends that the parenting schedule was not supported by the evidence and that the trial court abused its discretion by severely limiting his parenting time without making any finding that he was guilty of conduct that affected his ability to parent pursuant to Tenn. Code Ann. § 36-6-406(d). Specifically, Father asserts that by restricting his parenting time to approximately 48 hours per month and prohibiting overnight visits with the child, the trial court's parenting plan so severely limits his ability to parent his child that it has the effect of depriving him of the right to maintain the parent-child relationship, and that it was not in keeping with case law stating that the least restrictive limits are favored in order to encourage the parent-child relationship. *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001).

## ANALYSIS

### I. PARENTING PLANS AND SCHEDULES

The General Assembly has established the aspirational goal for the courts to craft custody arrangements that permit both parents to "enjoy the maximum participation possible in the life of the child" consistent with the appropriate factors and circumstances. Tenn. Code Ann. § 36-6-106(a). Still, the details of parenting plans remain "peculiarly within the broad discretion of the trial judge." *Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (citing *Armbrister v. Armbrister*, 414 S.W.3d 685, 693 (Tenn. 2013)). In making such decisions, the needs of the child are paramount, and the desires of the parent are secondary. *Chaffin v. Ellis*, 211 S.W.3d 264, 286 (Tenn. Ct. App. 2006). Furthermore, "[i]t is not the function of appellate courts to tweak a [residential parenting schedule] in the hopes of achieving a more reasonable result than the trial court." *Id.* (citing *Armbrister*, 414 S.W.3d at 693). This is because decisions regarding parenting arrangements are factually driven and require careful consideration of numerous factors, and trial judges, who have the opportunity to observe the witnesses and make credibility determinations, are better positioned to evaluate the facts than appellate judges. *Id.* (citing

*Armbrister*, 414 S.W.3d at 693). Accordingly, a trial court's decision regarding the details of a parenting schedule should not be reversed absent an abuse of discretion. *Id.*; *Armbrister*, 414 S.W.3d at 693 (citing *Eldridge*, 42 S.W.3d at 88). Nevertheless, discretionary decisions are not immune from meaningful appellate review because they must be based on the applicable law and the relevant facts. *Gooding v. Gooding*, __ S.W.3d __, No. M2014-01595-COA-R3-CV, 2015 WL 1947239, at *1 (Tenn. Ct. App. Apr. 29, 2015).

In all actions tried upon the facts without a jury, the trial court is required, pursuant to Tenn. R. Civ. P. 52.01, to find the facts specially, state separately its conclusions of law, and enter judgment accordingly. The underlying rationale for this mandate is that it facilitates appellate review by affording a clear understanding of the basis of the trial court's decision; in the absence of findings of fact and conclusions of law, this court is left to wonder on what basis the court reached its ultimate decision. *Id.* When a trial court fails to comply with Rule 52.01, the appellate court cannot determine whether the trial court applied the correct legal standard or what reasoning it employed. In such circumstances, the appellate court is not required to review the discretionary decision with deference. *Id.*

In this case, the trial court established a parenting plan and schedule that severely restricted Father's parenting time without identifying the legal principles it applied and without specially finding the relevant facts as Rule 52.01 requires. While there is no bright-line test by which to assess the sufficiency of the trial court's factual findings, the general rule is that "the findings of fact must include as much of the subsidiary facts as is necessary to disclose to the reviewing court the steps by which the trial court reached its ultimate conclusion on each factual issue." *In re Estate of Oakley*, No. M2014-00341-COA-R3-CV, 2015 WL 572747, at *10 (Tenn. Ct. App. Feb. 10, 2015) (quoting *Lovlace v. Copley*, 418 S.W.3d 1, 35 (Tenn. 2013)). That did not occur is this case; accordingly, the trial court failed to satisfy the Rule 52.01 mandate.

When the trial court fails to comply with Rule 52.01, we may conduct a de novo review of the record to determine where the preponderance of the evidence lies or remand the case with instructions to make the requisite findings of fact and conclusions of law and enter judgment accordingly. *Gooding*, 2015 WL 1947239, at *7 (citing *Lovlace*, 418 S.W.3d at 36; *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997); *Nashville Ford Tractor, Inc. v. Great American Ins. Co.*, 194 S.W.3d 415, 424 (Tenn. Ct. App. 2005)). Father requests this court to conduct an independent review of the record instead of remanding the case to the trial court because the trial judge has retired and remand would delay the case and increase the costs for both parties. Mother does not oppose Father's request. Accordingly, we shall conduct a de novo review to first determine where the preponderance of the evidence lies and then determine whether the evidence, when applied to the applicable legal principles, provides a proper factual foundation for the

decision challenged on appeal, that being the parenting schedule. *Gooding*, 2015 WL 1947239, at *7.

## II. DE NOVO REVIEW OF THE EVIDENCE

At the time of trial, both Mother and Father were in their late thirties, and their only child was thirteen months old. The parents had been married for approximately four months before the child was born.

Mother testified that during the parties' relationship, Father would occasionally have an alcoholic drink with dinner, which she did not consider problematic. However, Mother further testified as to specific times when Father engaged in excessive drinking that sometimes resulted in him becoming ill. Mother recounted four occasions *prior to* the birth of their child that Father drank in excess: a gathering at a friend's house in November 2012, the parties' rehearsal dinner, their wedding day, and a wedding celebration hosted by Father's family. Father testified that both he and Mother drank socially while they were dating and that he would have an occasional drink with dinner. Father admitted to drinking alcohol on the occasions alleged by Mother, which he emphasized were celebratory occasions, but denied that he ever drank to the point of becoming ill during the parties' marriage.

Mother also testified that Father smoked marijuana during the parties' relationship. On cross-examination, Mother admitted that she never saw Father smoke marijuana but stated that she could smell the scent of marijuana on him. Mother further testified that, a few weeks prior to the birth of their child, she found marijuana in the pocket of one of Father's winter coats that she was storing for the season. Mother testified that a couple of days after she found the marijuana Father asked her: "Hey, did you find the pot I was hiding in the garage?" Mother said she told Father she did not know what he was talking about.

Father's testimony was that the marijuana Mother found in his coat pocket did not belong to him. According to Father, after the parties' marriage, he had some of his employees move all of his belongings to Mother's home. Father testified that he found the marijuana in the coat pocket a few months later when he was organizing the garage. Father stated that he was not smoking at that time and did not know what to do with it. Father further testified that he did not tell Mother about the marijuana but admitted he should have told her and should have gotten rid of it. Father testified that Mother never brought the marijuana to his attention. He stated that he asked Mother about the marijuana when it became time to get the residence in order for the baby's arrival. Father admitted that he smoked marijuana at the wedding party hosted by his family but denied all other allegations of marijuana use made by Mother.

Mother testified that following the birth of their child, Father left the hospital and returned smelling of cigarettes and liquor. Father admitted leaving the hospital after the birth of the child to have dinner with his family but denied drinking any alcohol. He further testified that, at the time, Mother was sleeping, and the child was in the nursery.

Mother further testified that Father took prescription medication that was not prescribed to him. Specifically, Mother testified that Father's parents spent the weekend with them at the marital residence after the child was born, and that following this visit, she discovered a prescription pill bottle in Father's possession that belonged to his mother. Mother testified that the label was scratched through but that the prescription was still legible and was his mother's prescription for Lortab. Father testified that his aunt gave him the medicine after he told her that he was having difficulty sleeping. Father stated that his aunt's doctor gave her the medicine to help her sleep and that he was not sure what the pills were or why they were in the bottle they were in.

Father testified that he has not smoked marijuana since he has had visitation with the child and that he has not consumed alcohol during his parenting time with the child. He further testified that he has not driven with the child in the car while under the influence of alcohol and that he has no convictions for DUI or for any marijuana related charges. Father also testified that he had taken four drug tests during the pendency of the case and that none of them returned positive.

Mother testified that Father did not perform his parenting responsibilities during the marriage and left her alone to care for the child. Father testified that he worked during the day but that when he was home he changed diapers, emptied the diaper genie, held the child, and made sure the child had everything he needed. Father also testified that Mother would not allow him the opportunity to parent the child. As an example, Father stated that Mother made arrangements for the child's maternal grandmother to be at the marital home to care for the child when Mother went to work, even though Father was home and could care for the child without the grandmother's assistance.

It is undisputed that Father only spent one weekend at home with Mother and the child during the parties' marriage – the weekend following the child's birth. Father did not deny that he left Mother and the child at home while he elected to spend each weekend at the family farm. Father also did not dispute that he chose to go to Colorado with his friends instead of exercising the parenting time afforded to him in the temporary parenting plan.

It is also undisputed that, on two separate occasions, Father chose to spend time with friends while Mother stayed at home and cared for the child who suffered an ear infection. The first incident occurred approximately four weeks after the child's birth when Mother and Father attended a friend's wedding vow renewal celebration. Although the parties agreed they would only stay an hour, Father did not want to leave at the agreed

time, drove Mother home to be with the child, and then returned to the party. The second incident occurred in September or October 2013 when Father attended a basketball game in Nashville, Tennessee, and did not return home until 2:30 in the morning.

Significantly, it is undisputed that Father made inappropriate statements and exhibited very inappropriate conduct regarding the child's genitals on multiple occasions. The following testimony of Mother was not refuted by Father:

[Mother]. Well, when [the child] was at home -- and he probably wasn't but just a couple of weeks old -- [Father] was holding him while I was doing some household chores and stuff. I walked in the room and I said, "What are you doing?" He said, "Well, I think it's kind of neat and kind of funny when he gets stiff, you know, gets a little hard-on, a little woody." That's what [Father] ended up saying.

\*\*\*

[Counsel]. Was there an instant that occurred in the tub that caused you concern?

[Mother]. Yes, sir. There was an incident in the tub where I was giving [the child] a bath and [Father] pokes his head in there and says -- my mom was also in there with me during the bath time. [Father] pokes his head in there and says, "Pull on it, Granny, and watch it grow." [Father] was laughing about it and my mom made the statement to [Father] -- and I agreed with her -- that that was disgusting and that he needed to get out of the bathroom.

[Counsel]. Did that concern you?

[Mother]. Greatly concerned me.

\*\*\*

[Counsel]. Did you ever observe [Father] with changing the child's diaper where there was a problem?

[Mother]. Well, yes, sir. You know, [Father] didn't change very many diapers, but on one of them I was in the living room. I had just finished nursing him and asked [Father] would you like to go and change him because I'm going to go do a few things for myself. [Father] took [the child] and was holding him and took him into the baby's bedroom to change his diaper. While I was sitting on the couch -- I believe I was eating

peanut butter and crackers. That's typical for me to eat that. [The child] let out this really loud unusual cry. I put down my plate and jumped up and ran into the baby's room to find out what's going on, and all I see is [Father] kind of squeezing on his sac; his testicle sac.

[Counsel]. The baby's sac?

[Mother]. The baby's sac. Yes, sir.

[Counsel]. Okay. Was that a problem?

[Mother]. Absolutely. I asked [Father] -- I probably had that over concerned mother's voice on. I said, "What are you doing? What's going on?" [Father] said, "Oh, I'm feeling around to see if the family jewels have come in yet." I said, "[Father], that is not our job. That's the doctor's job to tell us if his testicles have dropped or not.

Furthermore, Father admitted that during one of his daytime visitations in December 2013, he left the then six-month-old child unattended in his car while he went into a convenience store to purchase tobacco.

As noted earlier, the General Assembly has established the aspirational goal for the courts to craft custody arrangements that permit both parents to "enjoy the maximum participation possible in the life of the child" consistent with the appropriate factors and circumstances. Tenn. Code Ann. § 36-6-106(a). Additionally, "[t]he general assembly recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and the relationship between the child and each parent should be fostered unless inconsistent with the child's best interests." Tenn. Code Ann. § 36-6-401(a). However, if the court determines that a parent's conduct "may have an adverse effect on the child's best interest," the court may limit a parent's residential time with his children. Tenn. Code Ann. § 36-6-406(d). Factors that justify imposing a limitation on parental visitation include:

(d) A parent's involvement or conduct may have an adverse effect on the child's best interest, and the court may preclude or limit any provisions of a parenting plan, if any of the following limiting factors are found to exist after a hearing:

(1) A parent's neglect or substantial nonperformance of parenting responsibilities;
(2) An emotional or physical impairment that interferes with the parent's performance of parenting responsibilities as defined in § 36-6-402;

- 10 -

(3) An impairment resulting from drug, alcohol, or other substance abuse that interferes with the performance of parenting responsibilities;

(4) The absence or substantial impairment of emotional ties between the parent and the child;

(5) The abusive use of conflict by the parent that creates the danger of damage to the child's psychological development;

(6) A parent has withheld from the other parent access to the child for a protracted period without good cause;

(7) A parent's criminal convictions as they relate to such parent's ability to parent or to the welfare of the child; or

(8) Such other factors or conduct as the court expressly finds adverse to the best interests of the child.

Tenn. Code Ann. § 36-6-406(d).

Father insists that "even *if* all of the conduct alleged by [Mother] is true," the alleged conduct does not fall within the factors provided at Tenn. Code Ann. § 36-6-406(d) to justify what Father describes as "the practical severing of the parent-child relationship." To support this assertion, Father relies on the case of *Melvin v. Melvin*, 415 S.W.3d 847 (Tenn. Ct. App. 2011) in which the trial court terminated all of the father's visitation based upon, *inter alia*, his inappropriate disparaging remarks about the mother to their children and the children's desire to not see their father. *Id*. at 851-52. This court reversed the trial court's ruling finding that "[t]here is simply no evidence that [the father] has inflicted harm on his children sufficiently severe to justify the practical severing of the parent-child relationship." *Id*. at 852. Father asserts that his alleged conduct "is no where [sic] near as severe as the facts in *Melvin*, yet the trial court restricted [Father] to a mere 48 hours per month with his child."

Based on our review of the evidence, even if we completely disregard Mother's allegations of Father's drug and alcohol abuse, we find that the undisputed facts concerning Father's inappropriate statements and conduct concerning the child's genitals provide sufficient proof to support a finding that this conduct is directly adverse to the best interests of the child. *See* Tenn. Code Ann. § 36-6-406(d)(8). Further, the evidence preponderates in favor of a finding of neglect and substantial nonperformance of Father's parenting responsibilities. *See* Tenn. Code Ann. § 36-6-406(d)(1). Examples of Father's neglect and substantial nonperformance of parenting responsibilities include, *inter alia*, his voluntary decisions to go to the family farm instead of spending time with his child, going on a trip with friends to Colorado in lieu of exercising his limited amount of parenting time with the child, and leaving the child unattended in a vehicle.

The foregoing notwithstanding, Father relies on the holding in *Melvin* to insist that the trial court erred by severely restricting his parenting time. We have determined that

Father's reliance on *Melvin* is misplaced because the facts are distinguishable. In *Melvin*, the father appealed from the trial court's order awarding him *no visitation* with the parties' children. *Id*. at 849. This court found that the record in *Melvin* did not support the *complete denial* of the father's rights to visit his children. In the present case, the trial court did not deny Father contact or visitation with his child. Instead, the trial court established a substantially restrictive parenting schedule for the first three years of the child's life. Thereafter, Father is granted 52 days of overnight parenting time, which includes weekends and vacations.

Having conducted a de novo review of the record, we find Father's inappropriate statements and conduct concerning the child's genitalia, which are undisputed, preponderate in favor of the finding that his conduct is directly adverse to the best interests of the child. *See* Tenn. Code Ann. § 36-6-406(d)(8). Further, we find the evidence preponderates in favor of a finding of neglect and substantial nonperformance of Father's parenting responsibilities. *See* Tenn. Code Ann. § 36-6-406(d)(1).

As Tenn. Code Ann. § 36-6-406(d) provides, the court may preclude or limit parenting time if a parent's conduct has an adverse effect on the child's best interest, and we conclude that Father has engaged in conduct that has an adverse effect on the child. Although the aspirational goal for the courts is to craft parenting plans that permit both parents to "enjoy the maximum participation possible in the life of the child," *see* Tenn. Code Ann. § 36-6-106(a), the facts in this case justify substantially restricting Father's parenting time. Accordingly, we affirm the parenting plan and parenting schedule.

### IN CONCLUSION

The judgment of the trial court is affirmed, and this matter is remanded with costs of appeal assessed against Stephen Matthew Thompson.

_____
FRANK G. CLEMENT, JR., JUDGE